ISABELLE BLASDEL, )
)
Plaintiff, )
)
vs. )          09 C 5576
)
NORTHWESTERN UNIVERSITY, )
)
Defendant. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on Defendant Northwestern University's ("Northwestern") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, Northwestern's motion is granted.

## BACKGROUND

Northwestern previously employed Plaintiff Isabelle Blasdel ("Blasdel") as an Associate Professor. In May of 2007, Northwestern informed Blasdel that it denied her tenure application and, thus, her employment would end on August 30, 2008.

On September 9, 2009, Blasdel filed a complaint against Northwestern, alleging gender discrimination and claims under Title VII of the Civil Rights Act of 1964. This Court previously dismissed Count I of the complaint. Blasdel's remaining claim rests on Northwestern's alleged gender discrimination in denying Blasdel tenure and

subsequently terminating her employment. Northwestern now moves for summary judgment on Blasdel's remaining claim. The following facts are undisputed for purposes of summary judgment.

**Northwestern's Recruitment of Blasdel**

From 1995 to 2002, Blasdel was an Assistant Professor at Boston University Medical School. During that time, Blasdel published no papers from 1997 to 2000, published one paper per year on average thereafter, and was first author on three papers between 1995 and 2002. While employed at Boston University, Blasdel sent a letter to Dr. James Surmeier ("Dr. Surmeier"), the Chair of the Department of Physiology at Northwestern's Feinberg School of Medicine ("FSM"), indicating her interest in a position.

Dr. Surmeier and Blasdel discussed the possibility of Blasdel joining Northwestern as an Assistant Professor, rather than the higher rank of Associate Professor, with a six-year tenure clock (i.e., the time before a tenure-eligible faculty member must apply for tenure). An incoming faculty member's proposed rank and tenure clock must be approved by the FSM Appointment, Promotions, and Tenure Committee ("FSM APT Committee"), FSM's Dean, and Northwestern's Provost.

Dr. Surmeier submitted a conditional offer letter to FSM's Executive Associate Dean for Faculty Affairs, Dr. James Young ("Dr. Young"), setting forth the proposed

terms of Blasdel's employment.  Dr. Surmeier proposed that Northwestern hire Blasdel as an Assistant Professor with a six-year tenure clock.  Dr. Young responded that the Provost was not likely to approve the recommendation of a six-year tenure clock, since Blasdel had already spent seven years as an Assistant Professor at Boston University. Dr. Surmeier then revised the conditional offer letter and proposed that Northwestern hire Blasdel as an Assistant Professor with a four-year tenure clock.  The FSM APT Committee recommended approving Blasdel's appointment, but expressed reservations about Blasdel's publication record, stating that "she has failed to cross important academic milestones in a timely manner," which was "worrying for someone who will start at the Assistant Professor rank again at another institution."

In February 2003, the Provost reviewed Blasdel's appointment materials and also expressed concerns about Blasdel's publication record and the length of time already spent as an Assistant Professor at Boston University.  In response to the Provost's concerns, Dr. Surmeier reiterated his faith that Blasdel would flourish at Northwestern and meet the standards for tenure in a short time.  The Provost later approved Blasdel's appointment as an Associate Professor with a four-year tenure clock.

By May 2003, before beginning her appointment in a tenure-eligible position, Blasdel knew she had four years to achieve tenure at Northwestern, even though the initial, conditional offer letter provided for a six-year tenure clock.  At the time of hire,

Blasdel did not request that Northwestern consider her for tenure and was satisfied with her four-year tenure clock and rank as an Associate Professor.

During her recruitment, Blasdel and Dr. Surmeier discussed employment opportunities for Blasdel's husband, Gary Blasdel. To make Blasdel's employment offer more attractive, Dr. Surmeier arranged for Gary Blasdel to interview at Northwestern and offered to pay half of Gary Blasdel's salary from the Physiology Department's budget.

Blasdel's hire package included $500,000 in start-up funds and $100,000, which Blasdel agreed to have distributed to her husband who was also hired by Northwestern. Blasdel also had access to graduate students and post-graduate trainees to work in her lab. Additionally, Plaintiff had approximately 900 square feet of laboratory space, which Plaintiff thought was a good size.

Blasdel's appointment as an Associate Professor, and her four-year tenure clock, began on September 1, 2003. At that point, Blasdel was well into her ninth year in an academic research position.

**Blasdel's Employment at Northwestern**

Blasdel's primary responsibility was to perform independent scientific research. Blasdel also understood her responsibility to obtain extramural funding. When Blasdel arrived at Northwestern, she had one source of extramural funding, which expired in

November 2003. While at Northwestern, Blasdel received only one other grant with extramural funding. Blasdel never submitted a grant proposal to Dr. Surmeier for review or feedback.

In 2004, during her annual evaluation, Dr. Surmeier told Blasdel that he did not think her plateau potential research, which was not extramurally funded, was a good project. Dr. Surmeier also expressed concerns about Blasdel's failure to publish any papers since arriving at Northwestern and about Blasdel's progression in her career. Along with another struggling project, Blasdel continued to work on the plateau potential project against Dr. Surmeier's advice.

As of June or July of 2005, Blasdel had not published any papers since 2002. At the time, Dr. Surmeier told Blasdel she was in trouble and needed to focus on her drug addiction research, which was extramurally funded. Despite Dr. Surmeier's advice, Blasdel continued to work on her plateau potential project. In January 2006, nearly three years after arriving at Northwestern, Blasdel published her first article.

**Northwestern's Recruitment of Dr. Bevan**

Around the same time Dr. Surmeier was recruiting Blasdel, he was also recruiting Dr. Mark Bevan ("Dr. Bevan"), who had been an Assistant Professor at the University of Tennessee since 2000. Prior to his employment, Dr. Bevan commented to Dr. Surmeier about Blasdel's questioning of a guest lecturer, stating "Man, that Isabelle is

scary!!!!"  In 2003, Dr. Bevan was appointed as an Associate Professor, with a six-year tenure clock, and began on the same day as Blasdel.

**The Lurie Building**

During Blasdel's recruitment, FSM prepared grant materials to obtain funding from the National Institutes of Health ("NIH") to build lab space for a group of neuroscientists in the Lurie Building.  The grant application listed six investigators who would be located on the proposed neuroscience floor, including Dr. Surmeier, Dr. Bevan, Blasdel, and three others.  As of April 2003, Dr. Surmeier planned for Dr. Bevan and Blasdel to share laboratory space in the Lurie Building.  However, by October 2003, Dr. Surmeier determined that the Lurie Building did not have enough space for him, Dr. Bevan, and Blasdel.  For this reason, Blasdel did not move her lab to the Lurie Building.  Blasdel was not the only individual who could not move into the Lurie Building, as two male scientists, also named in the Lurie grant application, did not move into the building.

**The Udall Center**

Before Blasdel's employment at Northwestern, Dr. Surmeier discussed with Blasdel his desire for Blasdel to collaborate with the members of a program funded by NIH to research Parkinson's Disease, now known as the "Udall Center."  Blasdel and

Dr. Surmeier discussed the possibility of Blasdel submitting a supplemental grant application after her arrival at Northwestern.

In 2003, Blasdel presented her work to the Udall Center members. Dr. Surmeier was the Principal Investigator and Dr. Bevan was a co-investigator of the Udall Center. Drs. Bevan and Wilson ("Dr. Wilson") challenged Blasdel's work after the presentation, perceiving significant shortcomings. According to Blasdel, Dr. Bevan called her work "shit," and Dr. Wilson stated that Blasdel "[didn't] know what [she was] doing."[1] After that meeting, when Blasdel expressed that she was not getting enough scientific feedback from Drs. Bevan and Wilson, Dr. Surmeier told Blasdel that he understood her "emotional need" to be heard.

In 2004, Dr. Surmeier e-mailed Dr. Wilson, stating that he wanted to add Blasdel to their group and "there is no question [Blasdel] is combative." Blasdel admittedly benefitted from feedback given by the Udall Center members and revised her methodologies. Dr. Surmeier invited Blasdel to a second meeting with the Udall Center members to present her revised work in the spring of 2004. Drs. Bevan and Wilson continued to question Blasdel's work. By 2004, there was a major scientific disagreement between Blasdel and Drs. Bevan and Wilson.

---

[1] Drs. Bevan and Wilson never referenced Blasdel's gender in any conversation they had with Blasdel, including the instances in which they challenged Blasdel's work.

In February 2004, Dr. Surmeier told Blasdel she should not submit a supplemental grant application at that time and should consider preparing an application for the next cycle. Blasdel never submitted a supplemental grant proposal to Dr. Surmeier. By the fall of 2004, Dr. Surmeier no longer invited Blasdel to participate in the Udall Center meetings.

In 2003 and 2004, Dr. Surmeier met with several faculty members at Northwestern, including three males and one female, to discuss the possibility of those faculty members developing new projects for the Udall Center. While two male faculty members submitted written proposals to Dr. Surmeier in 2004, Dr. Surmeier did not submit their proposals as supplemental funding applications.

**Blasdel's Tenure Clock**

According to FSM's policy, individuals hired as Associate Professors had a six year tenure clock. Northwestern, however, had the authority to abbreviate the tenure clock in consideration of previous service at another institution.

By June or July of 2006, Blasdel realized she was not ready to achieve tenure at Northwestern, due to her publication and funding records, and discussed the possibility of obtaining an extension of her tenure clock with Drs. Surmeier and Young. To extend the tenure clock, a faculty member must make a written request and should request an extension before the final year of the tenure clock. The faculty member's department

must support the extension. The Provost may grant an extension, where circumstances have caused substantial interference with the faculty member's research, including the birth, adoption, or rearing of a child.

Dr. Surmeier told Blasdel she may be able to obtain an extension, because Northwestern should accommodate the needs of "women scientists who reproduce." In June 2006, Dr. Surmeier, as he and Blasdel had discussed, asked Dr. Young whether Blasdel could potentially obtain a one year extension of her tenure clock because of family issues.[2] Dr. Young responded that a request based on family issues had only a small likelihood of being approved.

In September 2006, Blasdel met with Dr. Young and explained that she was unable to participate in the Udall Center and had spent an enormous amount of time seeking funding in the addiction field. Dr. Young informed Blasdel that she could possibly obtain an extension and told her to speak with Dr. Surmeier. Dr. Young also told Dr. Surmeier that he felt Blasdel could possibly obtain an extension because of the "unexpected problems" related to her research. On October 5, 2006, Dr. Surmeier screamed at Blasdel for speaking to Dr. Young behind his back and told her she was delusional if she thought she would be a part of the Udall Center. Although he

---

[2] Despite the fact that Dr. Surmeier and Blasdel discussed using family issues as a basis for an extension of her tenure clock, Blasdel admits that neither her parenting responsibilities nor her husband's employment situation interfered with her professional productivity.

disagreed with Blasdel's characterization of her need for an extension, Dr. Surmeier told Blasdel he would support her request. Ultimately, Blasdel decided not to request an extension of her tenure clock. Instead, near the end of October 2006, Blasdel submitted her tenure application.

**Northwestern's Tenure Decision**

Northwestern's and FSM's Faculty Handbooks contain the process and standards for achieving tenure. According to Northwestern's policies, faculty members seeking tenure are recommended by their Departmental APT Committee, reviewed by an Ad Hoc Committee, and then by FSM's APT Committee. Then, the candidate's application, the recommendations of the candidate's department and department chair, and the written reports of the Ad Hoc and FSM APT Committees, are reviewed by FSM's Dean and finally by Northwestern's Provost, who makes the final decision. If a faculty member is denied tenure during their final probationary year, the faculty member is generally given one terminal year in a non-tenure-eligible rank.

According to Northwestern's policies, tenure candidates in FSM are evaluated based on the following criteria: (1) continued publication of innovative, original research in refereed journals as first or senior author; (2) recognition for independent, original research that advances their field of study as demonstrated by external funding and evidence of ability to renew grants; (3) demonstrated excellence in research training

and professional education; (4) contribution to Northwestern; (5) external professional recognition, such as the receipt of prizes and awards, membership in societies and organizations, invitations to serve as a visiting or endowed professor, appointment to scientific or medical peer review bodies, and appointment to editorial boards.

Like all tenure candidates in FSM, Blasdel submitted her Curriculum Vitae, a personal narrative statement, and a list of eight to ten external referees. Blasdel sought advice from Dr. Young and colleagues in the Physiology Department about who to include among her list of external referees and what information to include in her personal narrative statement. In her personal narrative, Blasdel referred to herself as "one of the few women in the field of Ca channel biophysics." Combining Blasdel's time at Boston University and Northwestern, Blasdel worked for 11 years in a ranked faculty position before her tenure evaluation at Northwestern.

More than 20 senior scientists in neuroscience recommended tenure for Blasdel. Dr. Surmeier also wrote a letter recommending tenure, and referred to Blasdel as "an excellent female scientist" and "young female neuroscientist." The Physiology Department's Appointment, Promotions, and Tenure Committee ("Departmental APT Committee") also recommended awarding Blasdel tenure. Jim Baker, the chair of the

Departmental APT Committee, wrote a recommendation letter and noted that Blasdel was "an active mother with family responsibilities."[3]

Next, an Ad Hoc Committee composed of two female and two male tenured professors reviewed Blasdel's tenure application. The Ad Hoc Committee and FSM's Faculty Affairs Office selected additional external referees for Blasdel.[4] The Ad Hoc Committee members identified some reasons against awarding Blasdel tenure, including her "moderate publication record" and her "uneven" productivity. The Ad Hoc Committee Chair obtained permission to discuss the Ad Hoc Committee's concerns with Dr. Surmeier. Ultimately, the Ad Hoc Committee recommended awarding tenure.

The FSM APT Committee reviewers, Dr. Lavker (male) and Dr. Dubocovich (female), then reviewed Blasdel's tenure application. Both reviewers independently recommended denying tenure, because of Blasdel's low publication rate, including substantial gaps in her publication record, Blasdel's inability to obtain adequate extramural funding and renew extramural grants, and the relatively weaker than normal responses from the external referees. Additionally, Dr. Lavker recommended denying tenure based on Blasdel's minimal teaching and service record, paucity of invited

---

[3] Since Dr. Surmeier and Dr. Baker both recommended awarding Blasdel tenure, this Court limits its discussion of their letters to references to Blasdel's gender or family.

[4] Northwestern's policy permits the identification of outside referees by the candidate, the Department or Program Chair, the Promotions and Tenure Committee, or the Dean. In the year Blasdel applied for tenure, nine males also applied for tenure from FSM. The Faculty Affairs Office solicited referee letters for three of those nine.

lectures, lack of leadership positions in professional societies or editorial boards, and minimal participation in peer-review activities, such as study sections. Dr. Lavker also stated that

> [t]he demands of a family have been given as one of the mitigating circumstances underlying [Blasdel's] lack of productivity. I appreciate the weight that family can exert on one's career and that the woman quite often bears the brunt of many of these burdens. Many institutions grant an additional year on the tenure clock for each child in a family. If this has not been done for [Blasdel] then I strongly suggest that her clock be extended.

During an FSM APT Committee meeting on March 15, 2006, the members recommended denying tenure, by a unanimous vote of 6 to 0.[5] The FSM APT Committee concluded that Blasdel's scholarly productivity was below average, Blasdel's teaching and service contributions were minimal, and Blasdel had not demonstrated her ability to renew research awards.

Next, FSM's Dean, Dean Landsberg, evaluated Blasdel's tenure application. Dean Landsberg recommended denying tenure, because of (1) Blasdel's low scholarly productivity (including the fact that Blasdel had only published one article while at

---

[5] As was the common practice, one member abstained from the vote because he was a member of Blasdel's Department.

Northwestern), (2) Blasdel's insufficient indicia of external recognition in her field as demonstrated by the difficulty in securing positive letters of reference, the weakness of the letters secured, Blasdel's failure to secure a substantial number of awards or prizes, membership in professional societies, invitations to serve on boards, study sections, or editorial boards, and (3) Blasdel's insufficient contribution to Northwestern. Dean Landsberg, aware of Northwestern's policy to hire and retain female faculty members whenever possible, had concerns about denying tenure to a female candidate. Northwestern's Provost adopted Dean Landsberg's recommendation and denied Blasdel tenure.

At the end of May 2007, Northwestern informed Blasdel that her tenure application was denied and that her employment would end on August 30, 2008. Northwestern's policy permits faculty members to appeal a denial of tenure because of "discrimination on a basis not demonstrably related to the faculty member's performance, including . . . sex." Blasdel appealed the tenure decision "on the basis of gender discrimination." In Blasdel's written appeal, Blasdel complained about her exclusion from the Udall Center and the Lurie Building and about Dr. Bevan's and Dr. Wilson's refusal to interact with her. Blasdel also complained about the length of her tenure clock and the fact that the Physiology Department had no tenured females.

According to the policy, FSM's Executive Dean must deliver a response to the chairperson of the University Faculty Reappointment, Promotion, Tenure, and Dismissal Appeals Panel ("Appeals Panel"). FSM's Executive Dean, Dr. Young, after receiving an extension of time, submitted his response to the Appeals Panel. The Appeals Panel then advised Blasdel that it thoroughly reviewed her materials and that her appeal did "not sufficiently allege grounds of appeal within [its] stated jurisdiction."

**Northwestern's Tenure of Male Faculty Members**

In 2003, Dr. Lee Miller, a faculty member in the Department of Physiology, was granted tenure. Dr. Bevan applied for tenure in 2007, the same year as Blasdel, after only three years at Northwestern and only six years total in a ranked faculty position. While at Northwestern, between 2003 and 2006, Dr. Bevan was first author on six articles, while Blasdel was first author on one article. During that same time, Dr. Bevan presented as a speaker six times, while Blasdel presented once. The FSM APT Committee unanimously recommended tenure, finding that Dr. Bevan's scholarly productivity (including 23 peer-reviewed articles), ability to secure funding, and enthusiastic letters from senior neuroscientists, weighed strongly in favor of awarding tenure. Blasdel described Dr. Bevan as an excellent scientist, at the top of his field, and a world-class anatomist.

**Tenure Statistics**

Between 2001 and 2009, three men and two women who joined the FSM faculty had tenure clocks shorter than six years, with two men receiving tenure clocks as short as three years. Between 2002 and 2009, female tenure candidates in FSM had a 76.9 percent success rate compared to the 65.8 percent success rate for male tenure candidates. In 2007, the year Northwestern denied Blasdel tenure, Northwestern also denied tenure to two male faculty members. During Blasdel's employment at Northwestern, the Physiology Department had one tenured female faculty member, Dr. Sara Solla.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Illinois*, 627 F.3d 295, 297 (7th Cir. 2010). A court must construe all facts and draw all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). A court need not consider statements made in a declaration that contradict previous deposition

testimony. *LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) (stating that a plaintiff cannot defeat a summary judgment motion by contradicting deposition testimony with later-filled contradictory affidavits).

## DISCUSSION[6]

A plaintiff can prove gender discrimination under either the direct or indirect method. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008).

## I. The Undisputed Facts Demonstrate No Intentional Discrimination Under the Direct Method

Under the direct method, the plaintiff must present a "convincing mosaic" of direct or circumstantial evidence that could permit a jury to infer intentional discrimination by the decision maker. *Petts*, 534 F.3d at 720. Courts have recognized three types of circumstantial evidence, but only the first two types are relevant in this case. First, plaintiff can present evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which a jury can infer discriminatory intent. *Id.* at 721.

---

[6] As a preliminary matter, this Court previously granted Northwestern's motion to dismiss Count I, finding that any allegedly discriminatory acts occurring before September 29, 2006, were time barred and not actionable, including the decisions surrounding Blasdel's hire, the setting of her tenure clock, and the alleged exclusion of Blasdel from the Udall Center and the Lurie Building. However, Blasdel may rely on the time-barred acts, as background evidence, to support her claim that the tenure decision and subsequent termination violated Title VII. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (explaining that Title VII does not bar an employee from using prior, untimely acts as background evidence supporting a timely claim).

Second, plaintiff can present comparative evidence showing that similarly situated employees outside the protected class received systematically better treatment. *Id.*

Blasdel's circumstantial evidence consists of: (1) statements made by faculty members; (2) Northwestern's deviation from its procedures and policies; and (3) Northwestern's systematically better treatment of male faculty members.

## A.     Statements Made by Faculty Members

Blasdel argues that Dr. Bevan's statement that she was "scary," Dr. Surmeier's description of her as "combative," and Dr. Surmeier's reference to her "emotional need to be heard" provide circumstantial evidence of intentional gender discrimination. A statement raises an inference of discrimination if it was made by a decision maker, around the time of the decision, and in reference to the adverse employment action. *Petts*, 534 F.3d at 721. Statements not satisfying this standard are non-actionable stray remarks. *Id.* Dr. Bevan's gender-neutral statement, that Blasdel was "scary," does not directly evidence gender discrimination, because Dr. Bevan, who had not yet joined Northwestern's faculty, was not a decision maker, he made the statement several years before the tenure decision, and the statement was wholly unrelated to the tenure decision.[7]     Similarly, Dr. Surmeier's gender-neutral description of Blasdel as

_____

[7] For this same reason, this Court concludes that all of Dr. Bevan's statements are non-actionable stray remarks. *See, e.g., Petts*, 534 F.3d at 721 (concluding that a statement, made more than a year before plaintiff's termination and unrelated to the termination, was a stray remark that failed to prove the termination was motivated by gender discrimination).

"combative" and reference to Blasdel's "emotional need to be heard" fail to point directly to gender discrimination, because the statements are stray remarks, made years before, and completely unrelated to, the tenure decision.

Blasdel also argues that Dr. Surmeier made discriminatory statements when discussing an extension of her tenure clock and that Dr. Surmeier and tenure committee members made discriminatory statements in their recommendation letters. When determining whether a statement evidences gender discrimination, the court must consider the context in which the statement was made. *Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 625 (7th Cir. 2002) (explaining that context can negate the existence of discriminatory intent). Moreover, to constitute discrimination, the statement must be tied to an adverse action. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003, 1006 (7th Cir. 2000) (finding no discrimination where employer made statement after giving plaintiff, who was previously pregnant, a larger raise than non-pregnant employees).

When Blasdel discussed the possibility of obtaining an extension of her tenure clock with Dr. Surmeier, he told her that Northwestern should accommodate the needs of "women scientists who reproduce." As they had agreed, Dr. Surmeier then informally asked Dr. Young whether Blasdel could possibly obtain an extension based on family issues. The context surrounding Dr. Surmeier's statements negates any

discriminatory intent, considering that he made these statements while attempting to help Blasdel obtain an extension of her tenure clock. Further weighing against the possibility of discrimination, neither statement reflects Dr. Surmeier's disapproval of Blasdel's gender or family issues. *See, e.g., Silverman v. Bd. of Educ. of City of Chicago*, 2011 WL 941518, at *3 (7th Cir. Mar. 21, 2011) (affirming summary judgment where statement did not reflect disapproval of plaintiff's pregnancy). Moreover, Dr. Surmeier's reference to Blasdel's family issues is not gender-specific.

The remaining statements were made during the tenure review process by Dr. Surmeier, the Departmental APT Committee, the Ad Hoc Committee, and a member of the FSM APT Committee. The statements made by Dr. Surmeier, the Departmental APT Committee, and the Ad Hoc Committee included identifying Blasdel as "an excellent female scientist," a "young female neuroscientist," and "an active mother with family responsibilities." Significantly, each statement came from a person or committee *recommending* Blasdel for tenure. Certainly, this Court cannot find such statements discriminatory where each statement was made by an individual or committee advocating for Blasdel's tenure. *See, e.g., Miller*, 203 F.3d at 1006 (holding that supervisor could not be guilty of discrimination, even if his statement evidenced a discriminatory motive, where the statement was tied to a benefit given to the plaintiff and not an adverse action).

As to the statements made by a member of the FSM APT Committee, Dr. Lavker

attempted to justify Blasdel's lack of productivity, stating:

> [t]he demands of a family have been given as one of the mitigating
> circumstances underlying [Blasdel's] lack of productivity. I appreciate the
> weight that family can exert on one's career and that the woman quite
> often bears the brunt of many of these burdens. Many institutions grant
> an additional year on the tenure clock for each child in a family. If this
> has not been done for [Blasdel] then I strongly suggest that her clock be
> extended.

Dr. Lavker's statement is unmistakably dissimilar from the statements in the

cases cited by Blasdel. In *Chadwick v. Wellpoint, Inc.*, cited by Blasdel, the employer

informed the plaintiff of its decision not to promote her by stating, "[i]t was nothing you

did or didn't do. It was just that you're going to school, you have the kids and you just

have a lot on your plate right now." 561 F.3d 38, 42 (1st Cir. 2009) (finding that a

reasonable jury could infer plaintiff was denied the promotion because the employer

assumed that, as a woman with four young children, plaintiff would not fully commit

to the job). Further, in *Sheehan v. Donlen Corp.*, also cited by Blasdel, the employer

informed the plaintiff of its decision to fire her after she had two children and was

pregnant with the third, stating "[h]opefully this will give you some time to spend at

home with your children." 173 F.3d 1039, 1043 (7th Cir. 1999) (finding that a

reasonable jury might conclude that a statement to a pregnant woman that she is being

fired so she could "spend more time at home with her children" constitutes gender

discrimination).

The key issue is whether the decision maker took the adverse employment action

because of the employee's sex. *Petts*, 534 F.3d at 720. In *Chadwick* and *Sheehan*, a

jury could find that the gender-based statements demonstrated an intent to penalize each

plaintiff because she had children. Here, however, Dr. Lavker's statement demonstrated

an intent to aid, not penalize, Blasdel. Although he recommended denying tenure, Dr.

Lavker suggested that Northwestern extend Blasdel's tenure clock to help her obtain

tenure the following year. Indeed, Dr. Lavker believed Blasdel's family demands

partially excused the perceived deficiencies in her productivity. Blasdel cites no case

where a gender-based statement meant to *aid* the plaintiff constitutes gender

discrimination. No jury could reasonably infer discriminatory intent from Dr. Lavker's

statements.[8]

### B.    Northwestern's Procedures and Policies

Blasdel argues that Northwestern deviated from its procedures and policies by:

(1) failing to consider Blasdel for tenure at the time of hire; (2) refusing to give Blasdel

a six-year tenure clock; (3) soliciting additional referee letters for Blasdel; (4) allowing

---

[8] Blasdel correctly notes that this Court must deny summary judgment where a statement is ambiguous, citing *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990). However, this Court finds that the statements discussed above, made by individuals or committees recommending Blasdel for tenure or made in an attempt to aid Blasdel, are not ambiguous and that no jury could reasonably infer gender discrimination based on those statements.

the Chair of the Ad Hoc Committee to discuss Blasdel's application with Dr. Surmeier; (5) permitting Dr. Bevan, and not Blasdel, to use outside reviewers with whom he had a training relationship; and (6) refusing to hear Blasdel's appeal.

An employer's deviation from its stated procedures and policies provides circumstantial evidence of discrimination. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (holding that the employer's "systematic abandonment" of its hiring policies provided circumstantial evidence of discrimination). As a preliminary matter and as this Court previously held, half of the alleged "deviations" are time barred and not independently actionable under Title VII. In any event, the undisputed facts demonstrate that Northwestern did not deviate from its stated procedures and policies.


As to Blasdel's first, third, and fifth "deviations," Blasdel identifies no stated policy from which Northwestern could deviate. As to the first "deviation," no policy required Northwestern to consider Blasdel for tenure at the time of her hire and Blasdel did not ask Northwestern to consider her for tenure at that time. As to the third "deviation," no policy prevented the Faculty Affairs Office ("FAO") from soliciting additional referee letters. Consistent with its practice of soliciting additional letters when an insufficient number of letters are returned from the initial list, FAO solicited additional letters because only 18.2 percent of the referees initially chosen for Blasdel

responded compared to the 50 percent and greater response rate for other faculty members in the Physiology Department. More so, in the year Blasdel applied for tenure, FAO solicited additional letters for three of the nine male candidates from FSM. As to the fifth "deviation," Northwestern merely discouraged, and no policy prohibited, candidates from selecting mentors as external referees. Consistent with practice, both Blasdel and Dr. Bevan selected at least one mentor as an external referee.

As to Blasdel's second, fourth, and sixth "deviations," Northwestern complied with its stated procedures and policies. Concerning the second "deviation," Blasdel was not entitled to a six-year tenure clock, since Northwestern had the authority to abbreviate Blasdel's tenure clock "in consideration of previous service at another institution." Moreover, Blasdel was not the only individual who joined the FSM faculty with a tenure clock less than six years. Between 2001 and 2009, three men and two women who joined the FSM faculty had tenure clocks shorter than six years, with two men receiving tenure clocks as short as three years. As to Blasdel's fourth "deviation," the Chair of the Ad Hoc Committee complied with Northwestern's policy and received permission from the FAO before discussing Blasdel's application with Dr. Surmeier. Finally, as to Blasdel's sixth "deviation," the Appeals Panel did not convene an appellate body to adjudicate Blasdel's charges, because, after reviewing Blasdel's written appeal, the Appeals Panel found that her appeal did not contain sufficient

allegations of gender discrimination. For these reasons, this Court finds that no reasonable juror could conclude that Northwestern deviated from its stated procedures and policies.

### C. Northwestern's Treatment of Male Faculty Members

Blasdel argues that similarly situated male faculty members received systematically better treatment in the following ways: (1) Blasdel was excluded from the Udall Center, which only consists of male faculty members; (2) Blasdel was excluded from the Lurie Building, unlike Dr. Bevan; (3) Blasdel's tenure clock was 33% shorter than any male faculty member in the Physiology Department; (4) Blasdel was denied an extension of her tenure clock, unlike male faculty members; (5) Blasdel was given $100,000 less in start-up funds than male faculty members; (6) Blasdel received a lesser allowance for an interest-free loan than Dr. Bevan; (7) Blasdel received less mentoring and support than male faculty members, including Dr. Bevan; (8) Dr. Surmeier protected Dr. Bevan's work from encroachment by Blasdel, but not vice versa; and (9) Dr. Surmeier steered grant funding towards Dr. Bevan and not Blasdel.

A plaintiff can present circumstantial evidence of intentional discrimination by proving that similarly situated employees outside of the protected class received systematically better treatment. *Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*,

410 F.3d 387, 395-96 (7th Cir. 2005). Plaintiff must show that similarly situated employees are directly comparable in all material respects, including performance, qualifications, and conduct. *Id.* at 396. If the employer provides a legitimate reason for the differential treatment of plaintiff from other similarly situated employees and plaintiff provides no evidence suggesting a sexist motive for the differential treatment, plaintiff's discrimination claim fails. *Id.*

Blasdel's argument is fatally flawed for several reasons. First, Blasdel does not claim that similarly situated male faculty members received systematically better treatment during the tenure evaluation process, which is the heart of Blasdel's complaint. As this Court previously held, the allegedly discriminatory acts relied on by Blasdel are time barred and not actionable.

Second, Blasdel presumes, without demonstrating, that the male faculty members, including Dr. Bevan, were similarly situated. Even if Dr. Bevan and Blasdel were similarly situated, in many instances, Blasdel only claims that Dr. Bevan, and not male faculty members generally, received more favorable treatment. Thus, Blasdel cannot show that male faculty members, as a whole, received systematically better treatment.

Third, Blasdel blatantly overlooks the fact that male faculty members often received the *same* treatment as Blasdel. More specifically, two male faculty members were unable to join the Udall Center, two male faculty members were prevented from

moving into the Lurie Building, and two male faculty members in FSM received tenure clocks as short as three years. Accordingly, some male faculty members did not receive any better treatment.

Additionally, Blasdel was not denied an extension of her tenure clock, because Blasdel independently decided not to request an extension. Blasdel's failure to request an extension justifies any differential treatment by Northwestern in granting an extension to those who formally requested one.

Finally, Blasdel's hire package included $500,000 in start-up funds, rather than $600,000, because Blasdel agreed to have $100,000 distributed to her husband, who was also hired by Northwestern. After agreeing to the $100,000 distribution to her husband, Blasdel cannot now complain that she received less start-up funds than male faculty members.

## II. The Undisputed Facts Demonstrate No Gender Discrimination Under the Indirect Method

Under the indirect method, the plaintiff must first demonstrate a prima facie case of gender discrimination by proving that: (1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure. *Namenwirth v. Bd. of Regents*,

769 F.2d 1235, 1240 (7th Cir. 1985).[9] Once the plaintiff proves a prima facie case of gender discrimination, the defendant must then articulate a non-discriminatory reason for denying tenure. *Id.* Finally, the plaintiff must prove that the defendant's stated reason is merely a pretext for discrimination. *Id.*

## A.    The Undisputed Facts Do Not Demonstrate That Blasdel Was Qualified For Tenure

"Mere qualification depends on objective measures . . . , [but] [t]enure requires something more; it requires that the department believe that the candidate have a certain amount of promise. *Namenwirth v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 769 F.2d 1235, 1242 (7th Cir. 1985). "Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments." *Id.* at 1243. As the Seventh Circuit has acknowledged, "[i]t is not our role, as federal courts . . . [to] reach tenure decisions *de novo*." *Id.* at 1242. Rather, a "crucial part of the evidence we rely on is the esteem in which the candidate is held by the very persons making the tenure decision." *Id.*

Northwestern subjected Blasdel's tenure application to a multi-level review by the Departmental APT Committee, the Ad Hoc Committee, the FSM APT Committee, FSM's Dean, and the Provost. Ultimately, Northwestern denied tenure for a plethora

---

[9]  The first and third prongs of the indirect method are not in dispute, as Blasdel is a member of a protected class and was denied tenure.

of articulable reasons.  Absent evidence of a discriminatory motive, this Court must rely on the judgment of the experienced faculty committee members who determined that Blasdel was not qualified for tenure.  *See, e.g., Namenwirth*, 769 F.2d at 1243 (noting that "a plaintiff is bound to lose," where "it is a matter of comparing qualification against qualification").

Blasdel argues she was qualified for tenure, as evidenced by the overwhelming support in letters recommending her for tenure.  However, the letters of recommendation, alone, do not establish Blasdel's qualification.  Instead, Blasdel's qualification for tenure is based on the distinct criteria set forth in Northwestern's Handbook and Blasdel does not argue that, under that criteria, she was qualified. Further, Blasdel's own testimony undermines her argument, as she personally believed she was not qualified for tenure.  Blasdel testified that, as of June or July 2006, she realized she was not ready to achieve tenure at Northwestern, due to her publication and funding records.  Given our deference to decisions made by tenure experts and Blasdel's own testimony, we conclude that a jury could not reasonably find that Blasdel was qualified for tenure.

**B.     The Undisputed Facts Do Not Demonstrate That A Similarly Situated Male Applicant Was Granted Tenure**

Even assuming Blasdel was qualified for tenure, Blasdel has not demonstrated that a similarly situated male applicant was granted tenure.  Blasdel relies on the fact

that Dr. Miller and Dr. Bevan, two male faculty members, were both granted tenure, but fails to demonstrate how either was similarly situated.

As to Dr. Miller, Blasdel failed to present any admissible evidence regarding Dr. Miller's qualifications and, thus, this Court cannot determine whether Dr. Miller and Blasdel were similarly situated. *See, e.g., Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008) (finding summary judgment proper where plaintiff failed to present evidence that others were similarly situated).

As to Dr. Bevan, the undisputed facts demonstrate that he and Blasdel were not similarly situated and that the differences in their records justified different tenure decisions. *Namenwirth*, 769 F.2d at 1243 ("While [the plaintiff's] record was in many ways similar to the records of men who were tenured in the same time period, there were also differences which would have justified the difference in the votes."). Dr. Bevan applied for tenure the same year as Blasdel, after three years at Northwestern and only six years total in a ranked faculty position. Blasdel applied for tenure after eleven years in a ranked faculty position. Without question, at the time Northwestern considered Dr. Bevan and Blasdel for tenure, each was in a different place in their career. Even so, Dr. Bevan had published 23 peer-reviewed articles, the same number as Blasdel, in a much shorter time. Further, during their time at Northwestern and between 2003 and 2006, Dr. Bevan was first author on six articles, while Blasdel was

first author on one article. Moreover, Dr. Bevan presented as a speaker six times, while Blasdel presented once. Because Blasdel failed to demonstrate that a similarly situated male faculty member was granted tenure, Blasdel has not established a prima facie case of discrimination.

C. **Northwestern Has Articulated Non-Discriminatory Reasons For Denying Tenure To Blasdel**

Even if Blasdel could establish a prima facie case of discrimination under the indirect method, Northwestern has articulated non-discriminatory reasons for denying Blasdel tenure. The FSM APT Committee reviewers recommended denying tenure because of Blasdel's low publication rate, including substantial gaps in her publication record, Blasdel's inability to obtain adequate extramural funding and renew extramural grants, and the relatively weaker than normal responses from external referees. The FSM APT Committee, as a whole, also recommended denying tenure, concluding that Blasdel's scholarly productivity was below average, Blasdel's teaching and service contributions were minimal, and Blasdel had not demonstrated her ability to renew research awards. The Dean recommended denying tenure for largely the same reasons as the FSM APT Committee and the Provost adopted the Dean's recommendation. This Court finds that Northwestern has articulated non-discriminatory reasons for denying Blasdel tenure that directly relate to Blasdel's qualifications.

**D.     The Undisputed Facts Demonstrate That Northwestern's Stated Reasons Are Not A Pretext for Discrimination**

Blasdel argues that Northwestern's stated reasons for denying her tenure were pretextual on two grounds.  First, Blasdel provides evidence that she was qualified for tenure.  However, as the Seventh Circuit has specifically found, evidence of Blasdel's qualification for tenure does not demonstrate that Northwestern's reasons are pretextual. *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998) (finding that evidence of plaintiff's qualifications did not demonstrate that the university's reasons for denying tenure were pretextual).  Tenure decisions are based on the distinction between competent and superior achievement and "we must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons" for the decision. *Id.*

Second, Blasdel purports to show a pattern of discrimination and relies on statistics from the Physiology Department to demonstrate that, between 2002 and 2009, the Department awarded tenure to no females.  While the Department of Physiology awarded tenure to no females between 2002 and 2009, only one female - Blasdel - applied for tenure during that time period.  This Court cannot find a pattern of discrimination based on one denial of tenure. *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) (concluding that the court cannot infer discrimination without a "goodly sample").  Moreover, this Court finds that the statistics of FSM, as a whole, are

more relevant, given that faculty members from all departments in FSM participate in tenure decisions for each department within the school, including the Physiology Department. Between 2002 and 2009, the success rate of female tenure applicants (76.9%) was higher than the success rate of male tenure applicants (65.8%). This statistic belies a pattern of discrimination. Accordingly, this Court finds that Northwestern's stated reasons for denying Blasdel tenure are not a pretext for discrimination.

## CONCLUSION

For the foregoing reasons, this Court grants Northwestern's motion for summary judgment.


Dated:  **April 14, 2011**

**CHARLES P. KOCORAS**
**U.S. District Court Judge**